Judge Clifton and it please the court Thomas Phelan from Phoenix, Arizona. I'm sorry. With Peter Leander from Big Fork, Montana, on behalf of Mr. Brobst, with the court's assistance, I would like to reserve a couple, three minutes for rebuttal if we can. And I'd like to address three and perhaps four issues during my time. The first one I would like to discuss is the United States 28J motion, or letter. It's the Moore case? Yes, sir. The assertion is that the Virginia v. Moore case holds that in federal court the provisions of state law and state constitution with respect to Fourth Amendment seizures simply does not apply. Unfortunately, the Moore decision is a state prosecution, explicitly so, and does not address the proposition in Kirby v. California which says that for purposes of a federal prosecution, state law with respect to the legality of seizures governs. My rather crude research skills have revealed to me that the Kerr case has been cited with approval 68 times by the United States Supreme Court as recently as 2006. Virginia v. Moore conspicuously does not even discuss Kerr because it's simply an apposite. It's a state prosecution and a state conviction. So it is our position, unchallenged really by reference to Virginia v. Moore, that one must look to the Montana statutes, rules, and constitution to weigh the calculus of the legality of all Fourth Amendment seizures. I was perplexed a little bit when I considered that because I was surprised there was no discussion of Kerr, and yet the result you suggest seems anomalous. That is, in a state prosecution and state conviction, the Supreme Court has now said, I guess unanimously in Moore, that Fourth Amendment issues are still entirely federal and you don't pay any attention to the legality of the state arrest. And you're suggesting yet for a federal prosecution, you do pay attention to state law for a Fourth Amendment issue. That makes state law important in federal court and unimportant in state court. How can that be? Well, I can only speculate because it's not discussed clearly in Kerr. Kerr cites two 1948 cases, United States v. D. Ray, that's D-I, capital R-E. It's a 1948 case. And I've thought about this notion for some time, and I do a fair bit of habeas work, capital habeas in particular. And I know that if one is bringing a state conviction to the attention of the federal courts, clearly the federal courts are constrained to determine whether there's been a federal constitutional violation that has infected the conviction and sentence. I view Kerr as a case based on comity. That is to say that when the federal government is arresting and charging citizens of the several states, as a matter of comity, federal officers don't get a pass on the sometimes more restrictive provisions within each state. None of the cases directly address that, but the language in Kerr could not be clearer. And the language in United States v. D. Ray on which it is based could not be clearer. And the 68 cases that cite to Kerr, either tangentially or directly, similarly, could not be clearer. So, and because Virginia v. Moore simply does not distinguish or overrule or even mention Kerr, clearly it remains good law. The last United States Supreme Court decision to cite Kerr was in 2006. And Justice Scalia was the author in Virginia v. Moore, and surely it wasn't merely an oversight, and he certainly wasn't writing to overrule it if he didn't address it. So, with that in mind, I'd like to discuss a couple of salient claims. First, the particularity requirement and custody for purposes of the lack of Miranda warnings given to Mr. Brooks in his home. These are fairly well-worn constitutional claims grounded on the Fourth and Fifth Amendments, so these are not cases of first impression. And particularity issue, although the ultimate question is a de novo analysis for this Court, the factual findings are reviewed for clear error, obviously. But among the things that are troubling about this warrant are, first, the brevity of the description in the warrant and in the affidavit, itemizing which home was or which dwelling. It didn't even say home. Which dwelling was to be searched. It was a single-family dwelling with a shingle roof. And it's fairly undisputed that there were at least two structures on the premises itself that conformed to this, and several on the same street. So there were multiple dwellings. There was, you know, the patent problem with the address. One was 31 Driftwood Lane, Woods Bay, Montana. The other was 32-877 Driftwood Lane, Big Fork, Montana. So we have a numeral and a village discrepancy. There was actual uncertainty in the field. That is supported by the record amply. There was a finding by the district court in Document 50 of the district court record that the passers-by, variously incorrectly referred to as neighbors, were in fact not neighbors. That's a district court finding. There were two calls to dispatch made by the executing detective Yonkin, in which he was expressing uncertainty about where he was, to which he received no responses. I've got to say part of what concerns me here, I understand the facts you're laying out, and they're appropriate to raise, and yet what we have is a situation where the officers were trying to do the best they could to make sure they had the right place and, in fact, took efforts that we should commend rather than fault to make sure they didn't go barreling into the wrong house. I agree. And all the indications are that they got it right and that the description, although perhaps with an old address system, was something that you would have expected, but for the peculiar circumstances of the change of address, to have sufficed. When they got there and discovered, oh, gee, this isn't going to be quite so easy after all, because usually you have an address in hand, you think it's going to get you to the right place, then they made inquiries to make sure they had the right place, and, in fact, they did it correctly. So what exactly is the problem? I have trouble using the result to prove the adequacy of the method. That's bootstrapping and it's circular and it begs the question. Yeah, but it suggests that nobody's rights were particularly violated. Well, here's the way I think the Court should look at it. Yonkin himself was the one who authored the affidavit in support of the warrant. Yonkin had never been to the property. The cure that should have taken place under the circumstances of the case in which no exigency existed was once he arrived at the scene and determined that he was profoundly confused, he should have, in my opinion, not relied on the affidavit in sort of a good-faith way because he couldn't rely on the affidavit. What's the standard of review here? I'm sorry, sir? What is the standard of review we're really looking at here? Are we looking at a standard that requires particularity in the description to enable to locate and identify with reasonable effort and whether any reasonable probability exists the officers may mistakenly search? Now, when I read your brief, I get this standard, leave no room for uncertainty, obscurity, or discretion. Yes, sir. And I don't see that as a standard. Well, that's the Montana law that governs Fourth Amendment procedures. I understand where you're going with that, but is that the best you've got? No, sir. If one wants to apply a good-faith exception, that these efforts were indeed reasonable, then I must address that. In a typical good-faith excuse for relying on a warrant, I would surmise that the executing officers were not the ones who actually swore the affidavit out and presented it to the magistrate. And so with no uncertainty at all, they simply go up to the structure and enter. And after the fact, there is some dubiousness with respect to their conduct. And afterwards they say, well, we went to the place with absolute certainty relying on what we find out later was inadequate information. This isn't that case. This is a case in which Yonkin himself is relying on his own assertions to the magistrate. And my suggestion for the cure here is quite simple. He could have gotten on the phone and called Mr. Gerg, who was the carpenter who put in the shelves, and said, Mr. Gerg, can you help me here? I'm at this house, described it to him. Then he could have called the justice of the peace and said, Your Honor, I need you to amend the warrant to conform to the information that I now have because I was confronted with actual uncertainty in the field. That would have taken a handful of hours at most. This was not a case in which there was any indication that Mr. Brooks was alerted to this, that any of the evidence was in danger of being destroyed. That was the proper way for Mr. Yonkin to proceed. Our assertion is these were well beyond de minimis reasonable efforts to cure an otherwise nearly perfect warrant. This was from Idaho, I guess I'm wondering, because when I read Mann, Mann's warrant itself was wrong. And Mann's the one where we have to deal with trying to make this all apply. The warrant in Mann said on the west fork of the lower Dry Creek that the premises were on upper Dry Creek. And Mann said that was reasonable for a rural location. Well, and that might have applied this folksy construct that local law enforcement officers can be charged with knowing the nuances of the rural landscape. But it doesn't apply here because Yonkin, in fact, didn't know. Well, that isn't exactly what the district court found. District court did not find that Yonkin did not know.  But when he got there, he decided to make sure that his knowledge was, in fact, correct. Well, with due respect, Your Honor, I think that is clearly erroneous based upon the record. He's the one construing the facts. I understand. And he's the one who heard the officer's testimony, knew what came in, construed the facts, and I've got to look at the facts as found by him and find plain error. Yes, sir. Then try to do something with it. Well, perhaps this will help. Mr. Yonkin supplied AUSA Ms. Hurd with a sheaf of documentation outlining for her only all of the steps he took to get it right. He didn't share that with Mr. Leander until the time of trial. Now, I'm not saying he's intentionally concealing anything because Ms. Hurd had the obligation to share it with counsel. But what it shows is, ironically, the depth of his uncertainty, and although he was advancing it to Ms. Hurd as a way of showing that he did get it right, the fact that that was not disclosed to counsel at a pretrial setting to where he could challenge it feels like something less than good faith. And I go back to what the good faith exception really should mean, and I don't want to repeat myself too much. But that is the certain but incorrect searcher armed with a search warrant who, without doubt, walks up to the premises, enters, and conducts his search. This was a man who had actual doubt and expressed it in his actions and never received information in response to his questions to dispatch, never determined whether the persons who he characterized as neighbors were in fact reliable, and those people were never produced for purposes of pretrial motions hearing or the trial. Well, how could they possibly have been relevant to the trial? I mean, this issue has nothing to do with guilt or innocence of the client. No, I appreciate that. I'll tell you why. Because the issue didn't come up until trial. And Mr. Leander, when he was confronted with all this new information, the new information was that the officers talked to neighbors on the scene at trial. Mr. Leander moved to dismiss. And, of course, the judge responded by saying, you moved what? And denied the motion summarily without actually denying it. The record doesn't contain a word, motion denied. So that's why it was relevant at trial, because it's the first time that defense counsel knew about it. But all of these nuances, all of these indicia of uncertainty were confronted, confronted the defendant at trial. That's why I bring it up. And if I could talk just for a moment about custody for purposes of Miranda. Sure. Let me ask you to assume, let's assume custody. Yes, sir. What was said that wasn't said later after he was given his Miranda warnings? Well, I rely on Wong Sung to suppress the later statements, because the earlier statements, which provided probable cause for the arrest, were illegally obtained, so the arrest is illegal. Any of the fruits that How would the arrest be illegal? Because the arrest was explicitly based upon statements made by Mr. Brooks. That's what Yonkin said. He said, I arrested him because I had probable cause to believe that he was the perpetrator. Yonkin variously said, I didn't know anything about who the perpetrator was. I didn't even know his identity. And he says, only after succeeding in getting him to confess did I have probable cause to arrest him in his home without a warrant, which is a violation of the Montana statute and Constitution. He alternatively and later says it was necessary to arrest him because he knew much about Mr. Brooks. He knew that he was a wealthy man. He knew that he was likely to flee. And that kind of inconsistent, convenient testimony offered for purposes of supporting one position or another by Yonkin also goes to the aroma of lack of good faith, which I think infects both the taking of statements, the arrest of Mr. Brooks in his house, and the lack of declaration. Once they'd found what they'd found and confirmed your client's identity, what else did they have to know? Well, they found it necessary to bring him down to the police station and interrogate him. I'm at 244, and I'm hoping to preserve some time. But go ahead, please. We're really not talking about what they did or how they did it. We're trying to apply the law to the facts. And that's why I thought my colleague's question was pretty good. Once they determined his identity and they found what they found in the house, what more did they need? I don't care what Yonkin says. Police officers can say what they want to. What more did they need? They had succeeded through an illegal search and an illegal arrest and illegal obtaining of statements. They had succeeded in getting pretty much all they needed to prosecute this man. That's a nice way to respond to the question, but that wasn't the question I asked. Thank you. You might be good to sit down now. I apologize, Your Honor. I reserve two minutes. Okay. We'll hear from the government. Yeah, Eric Wolfe from the District of Montana. Your sheet originally said Marcia Heard. You may have seen my name on the 20HA letter, and I sent a notice of appearance, but I mistakenly sent it to San Francisco. Unless the court would like me to take it in a different pattern, I'll just go through the entire encounter and explain the government's points at each step, but I'm happy to address anything the court wants to address. On the search warrant, the argument that he makes is particularity. That just fails. The warrant is particular. The issue is just execution. This was reasonable. It was suggested by the court. This is what you want officers to do. You want them to double check. I don't want this to get into semantics, but, in fact, with regard to particularity, it is clear that there was some uncertainty once the officer arrives on the scene as to what location is this. Isn't that a particularity problem? Let me just speak to that. He has a warrant that has the old address. He understands that addresses have changed because they've made this little community of Woods Bay part of Big Fork, which is a slightly larger community. He understands that. But this notion that he's profoundly confused is just silly. He's standing there. There's a sign that says Brobst. There are two passersby, and they say that's where Jerry Brobst lives. It meets the description he got from the tipster, and he knows that there's been this change of address system. In terms of reasonableness, he testified at the bench trial, I was certain I was at the right place. I called dispatch because I just want to make sure that I'm at the right place. I want to double-check. He doesn't even get anything back from dispatch because they're tied up, so then they go ahead and search, and, of course, it was the right house. If I could just say, if there were any doubt at all about the reasonableness of this, it's good faith, because there's no sign of bad faith on the part of anyone involved here. They really don't address good faith in their brief. The district court very appropriately raised good faith because, while it's similar to man, it certainly falls within the normal standards for reasonable execution. You don't even need to get there because of good faith. So now they're in the house. They're searching. They find the photos that the tipster had mentioned. Brobst and an acquaintance pull up in a car. They come into the house. There's no real dispute about fact-finding from that point on. One of the deputy's viewers goes out and says, you need to come inside and talk to the detective. They go inside. They're all kind of standing in the entryway. The detective says, I've got a search warrant. This is what we're searching for. We found these. Are they yours? And he says, it's my house. They're mine. Okay, at that point, he's not in custody for Miranda purposes. This is not the functional equivalent of formal arrest, and they don't cite a single case that is even close. The case that's cited by the magistrate judge, United States v. Ritchie, which is a Tenth Circuit opinion, and we certainly could have played it up in our brief and probably should have because that was a very good citation by the magistrate judge. That case is very close, very similar. But as Judge Clifton, as you said, it doesn't matter because after they arrest him, they take him to the station. They Mirandize him. He admits all the same stuff. So it really doesn't matter. When counsel for the defendant was posed the question, how do you get around that, that he admits it all later? He says, oh, I get around that through the poisonous tree, Wong Sung. Wrong. Wong Sung does not apply to Miranda violations. That's Oregon v. Elstead. That's Patain. I think he knows that. What he does is go back earlier in the chain, which is getting inside the house in the first place. In fact, as I understand it, it's a recycle that goes back to the search argument. I think that's right, although that was not clear to me. We'll give him a chance to articulate for himself, I guess, but that's what I thought I heard. There's a section in his brief where I didn't know what he was arguing because he makes it sound like even if you had a valid search warrant, you also needed an arrest warrant, and the judge should have reviewed why this was a warrantless arrest. Well, maybe he... You'd know this better than I do. Is that somehow a requirement of Montana law? This may seem a startling admission. I am so confident that you do not follow Montana law that I do not need a single Montana Supreme Court case to prepare for this argument. Again, my sense of the argument was that, gee, that's not how it usually is, but Montana can do what it wants to. Now, frankly, I hadn't been thinking... I hadn't gone all the way down the road, but, again, that's what I think I heard him say, or how I understood the argument. States do have these limitations on arrest authority, and actually Virginia v. Moore has a nice discussion of that. They say one of the main reasons they have it is not because of some great grand constitutional theory, it's because arresting people costs a lot of money because when you arrest them, you have to bring them in and house them somewhere. And so they try and, you know, make a cost-benefit tradeoff about who they're going to arrest. If I could just address his treatment of Virginia v. Moore, and why does it not cite Kerr? Okay, it does cite DeRee and Johnson, and that's what Kerr relies on. Now, in Kerr, Kerr is an interesting case. Kerr is, like, shortly after Mapp v. Ohio. This is, like, in the creation stage of using the exclusionary rule on the states. Back then, as recounted in Virginia v. Moore, Federal arresting authority was in a lot of ways tied to State arresting authority as a matter of statute. This is discussed in Virginia v. Moore. When the Kerr court gets to this issue, they certainly say this Court has recognized lawfulness of arrest. I'm reading it, by the way. Lawfulness of arrest is a term I reference to State law, insofar as it is not violative of the Federal Constitution. They then have a long paragraph. They find no violation of State law. So it didn't matter. Kerr v. California is not a case where they said, oh, you violated State law, you get suppression. They found no violation of State law. By the time you get to Virginia v. Moore, they go through, and I'm now holding Virginia v. Moore, they go through DeRee, they go through Johnson. Okay, they don't mention Kerr. So what? They mention the cases that Kerr refers to. And then they say, we need not pick and choose among the dicta. Neither DeRee nor the cases following it held that violations of State arrest law are also violations of the Fourth Amendment. And our more recent decisions, discussed above, have indicated that when States go above the Fourth Amendment minimum, the Constitution's protections concerning search and seizure remain the same.  That's the bottom line. They're not different in Montana. So it's actually a very important point of law. And to be honest, lots of people cite State court decisions as if they could apply. And I think the Supreme Court has clarified that they don't. I don't really have anything else unless the Court has questions. Apparently not. Thank you. Mr. Phelan. At the risk of repeating myself just briefly on Moore, Moore was a State conviction, and Kerr applies to Federal convictions. And on that distinction, Virginia v. Moore has no applicability in this case. With respect to the questioning of Mr. Brost, in order for the Detective Yonkin, to successfully make the proper arrest, he had to determine for himself whether the materials that he had found belonged to Jerry Brost Sr. or some other member of the household. And that's why the questioning in the kitchen was so critical. And let's talk about Montana law with respect to in-home arrests. The Montana statute, as construed by the Montana State Court, clearly says that an in-home arrest in Montana must be accompanied by an arrest warrant. And it wasn't done here. And if we could talk for a minute about the scene that Mr. Brost confronted. He was ordered into the house by an armed deputy in uniform  Mr. Brost was shoulder-to-shoulder with two detectives, one of whom was armed. And the question, understands very well, is would a reasonable person in Mr. Brost's place have felt free to leave? And the district court says yes. Recognizing that time is waning, let me ask you again to jump to the second half. Assume for a moment that we'll say custody. I've got the same question I had before, which is, what is it that he said at the time that he didn't say later? Now, the answer I thought I heard before said, well, that what he said then was critical to the arrest. I didn't understand what was said that was critical to the arrest, so I didn't understand the rest of the argument that flowed from that. Yes, I'm sorry then. That's my fault. What he said was, when asked, he was confronted with the criminality of his act. He was confronted with the materials. He was asked, is this your stuff? He says, this is my house. Everything in it must be mine. He tangentially, but without doubt, answered the question, thereby excluding anyone else. So he took responsibility. And being confronted with his criminality is one of the factors that you have to take into account to determine whether a person is in custody. But my question with respect to Stansbury for the Court is, where would Mr. Brobst have fled if not to his own home? Because his own home, which is sacrosanct under the Montana Constitution and the United States Constitution, was invaded by law enforcement officers. So the conclusion of the Court that he was sure he was free to leave and a reasonable person would have felt free to leave is simply untenable. For what it's worth, the deputy who was in uniform and was armed and who positioned himself at the door testified that he believed that a reasonable person in Mr. Brobst's position would not have felt free to leave. So for all those reasons, Judge, and I apologize to you, Your Honor, if I misspoke, I'd ask that you reverse the convictions and sentences of Mr. Brobst. Thank you very much. Thank you, and we thank your colleague across the aisle for their arguments. The case just argued is submitted for decision.
judges: Clifton, Smith, Sandoval